IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


UNITED STATES OF AMERICA,    :
                            :
        Plaintiff,     :
                            :
    v.                :  Criminal Action No. 07-28-JJF
                            :
LICURTIS G. WHITNEY and    :
JONATHAN EWELL,          :
                            :
        Defendants.    :

---

Colm F. Connolly, United States Attorney, and Gregory Welsh, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Peter Levin, Esquire, Philadelphia, Pennsylvania.

Attorney for Defendant Licurtis G. Whitney.

Edson A. Bostic, Esquire, Federal Public Defender, of the FEDERAL PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

Attorney for Defendant Jonathan Ewell.

---

### MEMORANDUM OPINION

May 9, 2008
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion To Suppress Physical Evidence And Statements (D.I. 33) filed by Defendant, Licurtis G. Whitney, and a Motion to Suppress Physical Evidence (D.I. 26) filed by Defendant, Jonathan Ewell.  For the reasons discussed, both Defendants' Motions will be denied.

## I.   BACKGROUND

On March 15, 2007, Defendants, Licurtis G. Whitney ("Mr. Whitney") and Jonathan Ewell ("Mr. Ewell") were indicted for possession with intent to distribute more than 50 grams of cocaine base, in violation 21 U.S.C. § 841, and conspiracy to possess with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. § 846.  Mr. Licurtis filed a Motion To Suppress (D.I. 33) seeking to exclude statements and physical evidence he alleges were obtained in violation of his Fourth and Fifth Amendment rights.  Mr. Ewell also filed a Motion to Suppress (D.I. 26), seeking to exclude physical evidence he alleges was obtained in violation of his Fourth Amendment rights.

By his Motion, Mr. Whitney contends that law enforcement officers lacked probable cause to justify the stop of his vehicle on December 10, 2006, and, even if the stop was justified, the law enforcement officers lacked reasonable cause or suspicion to justify the subsequent warrantless search of his vehicle.  Mr. Whitney contends that, because the search of his vehicle was

2

illegal, all physical evidence seized from the search must be suppressed. Further, Mr. Whitney contends that he was questioned by law enforcement officers without adequately receiving his <u>Miranda</u> warnings, and therefore the Court should suppress the statements he made to law enforcement officers during the December 10, 2006 traffic stop, as well as the statements he made to Special Agent Gorrell on March 6, 2007.

By his Motion, Mr. Ewell contends that law enforcement officers lacked probable cause to justify the stop of the vehicle in which Mr. Ewell was a passenger, and, even if the stop was justified, law enforcement officers lacked probable cause or reasonable suspicion to justify the subsequent warrantless search of the vehicle. Mr. Ewell contends that, because the search was illegal, all evidence seized from the search must be suppressed.

The Court conducted an evidentiary hearing on December 5, 2007, and briefing was completed on February 25, 2008. At the hearing, Corporal Stephen Brock ("Corporal Brock"), and Officer Malcolm Stoddard ("Officer Stoddard"), of the Wilmington Police Department; Delaware Probation Officer William DuPont ("Officer DuPont"), (collectively, "the officers") and Special Agent David Gorrell ("Special Agent Gorrell") of the United States Alcohol, Tobacco and Firearms Bureau ("ATF ") testified.

3

## II.  FINDINGS OF FACT

1.  On December 10, 2006, in the early morning hours,
Corporal Brock, Officer Stoddard and Officer DuPont were
patrolling in Wilmington, Delaware as part of Operation Safe
Streets.[1]  (D.I. 44 ("Tr.") at 5.)  During a traffic stop, the
Officers received information from an informant. (Tr. 5-6.)

2.  The informant told the Officers that occupants of a
white Acura with Maryland tags and tinted windows were picking up
a significant quantity of controlled substances near the
intersection of 27th Street and Madison Street, in Wilmington,
Delaware.  (Id.)  The informant was known personally to Corporal
Brock and Officers Stoddard and DuPont, but had not provided
information to them previously.  (Tr. 25, 57, 89.)

3.  Corporal Brock immediately responded to the 27th
Street location in an unmarked vehicle, and observed a white
Acura with Maryland tags and tinted windows parked on the south
side of 27th Street, occupied by at least two people and running.
(Tr. 6, 28.) He observed that the front passenger window was down
and that a black male was standing on the sidewalk, leaning on
the Acura, engaging in conversation with the car's passengers

---

[1]Operation Safe Streets is a joint police and probation
program designed to curb violent and drug-related crime in the
City of Wilmington by apprehending offenders who fail to comply
with the terms of their probation. (Tr. 5; see also Ayers v.
Kearney, No. 03-281-GMS, 2005 WL 1106078, at *6 n. 3 (D. Del. May
6, 2005).

4

through the open window.  (Tr. 14.)

   4.    Corporal Brock circled the block, and, as he returned to the intersection of 27th Street and Madison Street, observed that the Acura was now traveling southbound on Madison Street. (Tr. 7.)  Corporal Brock followed the Acura from approximately a block behind to the intersection of Madison Street and 24th Street, where he observed the Acura make a right turn onto 24th Street without using its turn signal.

   5.    The Acura and Corporal Brock's vehicle were the only cars in operation on Madison Street at this time. (Tr. 15.)

   6.    Corporal Brock was driving an undercover vehicle not equipped with emergency equipment. (Tr. 8.)  Therefore, he immediately radioed Officers Stoddard and DuPont, and requested their assistance for a motor vehicle stop.  (Tr. 8.)  Because Officers Stoddard and DuPont were located only a few blocks away, they arrived almost immediately. (Tr. 17, 41, 91.)

   7.    Corporal Brock continued to follow the Acura until it was stopped by Officers Stoddard and DuPont, at which point he pulled his vehicle behind Officers Stoddard and DuPont. (Tr. 8-9, 28.)

   8.    At approximately 1:58 a.m., Officers Stoddard and DuPont activated their vehicle's emergency equipment, specifically, its siren, and stopped the Acura at the intersection of Concord Avenue and Broom Street, just east of

5

Interstate 95. (Tr. 34.)

9.      Officers Stoddard and DuPont approached the Acura on
foot, while Corporal Brock remained in his vehicle.  (Tr. 28.)
Officer DuPont carried a Q beam, a handheld two-million
candlepower spotlight, and Officer Stoddard carried a mag light.
(Tr. 35, 46.)  Officer DuPont's flashlight illuminated the Acura,
and, as they approached, Officers DuPont and Stoddard noticed the
driver of the Acura was moving around the vehicle, and reaching
behind his seat. (Tr. 35.)

10.      Officer DuPont approached the driver's side of the
vehicle, while Officer Stoddard approached the passenger's side
of the vehicle.  (Tr. 44.)  The driver of the vehicle, Mr.
Whitney, lowered his car window, and Officer DuPont informed Mr.
Whitney that he had been pulled over for a turn signal violation.
(Tr. 36.) Officer DuPont requested Mr. Whitney's driver's
license.

11.      Mr. Whitney began searching for his driver's
license, patting his jacket and pants for it, and beginning to
reach for the Acura's center console and glove compartment. (Tr.
36, 68.) At this point, Officers DuPont and Stoddard noticed that
both occupants were nervous and jittery, and exhibiting labored
breathing.  (Tr. 36.)

12.      The occupants' behavior caused Officers DuPont and
Stoddard concern that a firearm was present in the Acura;

Officer DuPont asked Mr. Whitney to hand him the vehicle's keys, and told Mr. Whitney to place his hands on the steering wheel. (Tr. 36, 68)

13.     Officer DuPont then noticed several small white crumbs or "specks" on the folds of Mr. Whitney's jacket. (Tr. 37, 69, 80.)  Officer DuPont testified that the crumbs "appeared to be consistent with that of crack cocaine." (Tr. 69.) Officer DuPont asked Mr. Whitney what the white crumbs were, and Mr. Whitney responded that he did not know.  (Tr. 69.)

14.     Officers DuPont and Stoddard then flashed their lights around the interior of the vehicle and, behind the driver's seat, Officer DuPont observed a clear knotted sandwich bag containing a large quantity of an off-white chunky-type substance, consistent with crack cocaine. (Tr. 37.)[2]

15.     Officer DuPont then asked Mr. Whitney to exit the vehicle, which he did, and Mr. Whitney was placed in handcuffs and taken into custody. (Tr. 38.)

16.     Officer DuPont then retrieved the bag of suspected crack cocaine from the back seat; he noticed that it was unusually warm, indicating that "it had just been packaged and removed from the stove where it was cooked."  (Tr. 71.)

17.     During this time, Officer Stoddard observed a second

---

[2]Both Officers Stoddard and DuPont testified to their extensive training and experience identifying crack cocaine. (Tr. 37, 70.)

clear plastic sandwich bag containing a large quantity of an off-white chunky-type substance, consistent with crack cocaine, resting on Mr. Ewell's right hip and partially concealed by his jacket.[3] (Tr. 38.)

18.    Officer Stoddard asked Mr. Ewell to exit the vehicle once Mr. Whitney had been secured in handcuffs. (Tr. 38.)  When Mr. Ewell exited the vehicle, the bag resting on his right hip fell out of the vehicle and landed on Officer Stoddard's right foot.  (Tr. 38.)

19.    Mr. Ewell was handcuffed and taken into custody. (Tr. 20.)

20.    Both Mr. Ewell and Mr. Whitney were advised of their Miranda rights at the Wilmington Police Station, and both Mr. Ewell and Mr. Whitney invoked their rights. (Tr. 39.)

21.    In addition to the drug-related charges, Mr. Whitney was cited for a traffic offense for his failure to signal a turn. (Tr. 39.)

22.    Mr. Whitney was arrested for the instant charges by Special Agent Gorrell on March 6, 2007 at his residence at 108 Oak Street, Pocomoke City, Maryland.  (Tr. 95-96.) After Mr. Whitney was placed in handcuffs, Special Agent Gorrell advised

---

[3]Although Officer Stoddard's hearing testimony differed from the information he provided in February 2007 that Officer DuPont had alerted him to the bag of crack cocaine on Mr. Ewell's lap (Tr. 51), the Court finds the differences do not cause the Court to discredit Officer Stoddard's hearing testimony.

8

Mr. Whitney of his <u>Miranda</u> rights.  (Tr. 96.)

     23.    Special Agent Gorrell read each right to Mr. Whitney, and Mr. Whitney indicated his understanding by initialing beside each right on a form provided by Special Agent Gorrell.  (Tr. 97.)

     24.    Mr. Whitney also signed a written form indicating that he waived his <u>Miranda</u> rights.  (Tr. 97; Gov't Exh. 1.) Special Agent Gorrell signed below Mr. Whitney as a witness, with the date and time. (<u>Id</u>.)

     25.    At the time Mr. Whitney was arrested by Special Agent Gorrell, he was 29-years-old and owned his own trucking company, which employed several individuals.  (Tr. 98.)  Mr. Whitney also owns several real estate properties. (<u>Id</u>.)

## III. CONCLUSIONS OF LAW

    A.    <u>Whether the Physical Evidence Seized During the Stop of the Vehicle Should be Suppressed</u>

     26.    The Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." <u>U.S. v. Delfin-Colina</u>, 464 F.3d 392, 396 (3d Cir. 2006) (quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979)).  "Because a traffic stop is analogous to an investigative detention, it has been historically reviewed under the investigatory detention framework first articulated in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)." <u>Delfin-Colina</u>, 464 F.3d at 396. In

9

<u>Terry</u>, the Supreme Court held that, while warrantless searches
are presumptively unreasonable, a law enforcement officer need
not have probable cause to detain a suspect under certain
circumstances: "when an officer is only making a brief,
investigatory stop, he may do so whenever he has a reasonable,
articulable suspicion that criminal activity is afoot." <u>U.S. v.
Fleetwood</u>, 253 Fed.Appx. 892, 895 (3d Cir. 2007).

    27.  "The legality of the seizure depends upon the legality
of the traffic stop." <u>U.S. v. Mosley</u>, 454 F.3d 249, 253 (3d Cir.
2006).  "[A] traffic stop will be deemed a reasonable 'seizure'
when an objective review of the facts shows that an officer
possessed specific, articulable facts that an individual was
violating a traffic law at the time of the stop." <u>United States
v. Delfin-Colina</u>, 464 F.3d 392, 398 (3d Cir.2006) (citing <u>Whren
v. United States</u>, 517 U.S. 806, 808-09 (1996).

    28.  Whether the police have reasonable suspicion is
determined from the totality of the circumstances.  <u>Delfin-
Colina</u>, 464 F.3d at 397.  The subjective intentions of law
enforcement officers play no role in the analysis of whether
reasonable suspicion or probable cause justifies a stop or
arrest.  <u>Whren</u>, 517 U.S. at 808-809; <u>Delfin-Colina</u>, 464 F.3d at
398 (collecting cases)

    29.  Based on the totality of the circumstances in this
case, the Court concludes that the law enforcement officers had

10

reasonable suspicion to conduct the traffic stop of the Acura

driven by Mr. Whitney in which Mr. Ewell was a passenger.

Corporal Brock testified that he observed the Acura make a right-

hand turn onto 24th Street without using its turn signal, which

is a violation of 21 Del. C. § 4155. (Tr. 7.)   Section 4155

states, in relevant part, "No person shall so turn any vehicle

without giving an appropriate signal in the manner hereinafter

provided."   Thus, Corporal Brock has "met his burden to provide

specific, articulable facts," <u>Delfin-Colina</u>, 464 F.3d at 400,

demonstrating that an officer would reasonably believe that the

driver of the Acura had violated 21 Del. C. § 4155.[4]

---

[4]Alternatively, the Court finds that the law enforcement
officers had reasonable suspicion justifying the vehicular stop
based on the informant's tip.   To determine whether an
informant's tip possesses sufficient indicia of reliability, the
Court must consider whether, given the totality of the
circumstances, law enforcement officers had an objectively
reasonable suspicion "sufficient to justify a <u>Terry</u> stop."   <u>U.S.
v. Nelson</u>, 284 F.3d 472, 482 (3d Cir. 2002)..

> [A] tip given face to face is more reliable than an
> anonymous telephone call...when an informant relates
> information to the police face to face, the officer has
> an opportunity to assess the informant's credibility
> and demeanor. And when an informant gives the police
> information about ... someone nearby (as in our case),
> the informant is exposed to the risk of retaliation
> from the person named, making it less likely that the
> informant will lie.

<u>U.S. v. Valentine</u>, 232 F.3d 350, 354 (3d Cir. 2000).   Here, the
totality of the circumstances support the reliability of the
tip: (1) although the informant had not previously provided
information to the officers, the informant was personally known
to two of the three law enforcement officers, who could have
located the informant in the future "if the tip did not pan
out" (<u>Id</u>. at 355); (2) the officers had the opportunity to
assess the informant's credibility face to face; and (3) the

30.   Mr. Ewell and Mr. Whitney both contend that Corporal
Brock had motivation to fabricate the turn signal violation so
that the Officers could investigate suspected drug activity.
(D.I. 52 at 6; D.I. 51 at 10.) However, the Court credits
Corporal Brock's testimony regarding his observation of the
traffic violation, and notes that, after stopping his vehicle,
Officer DuPont immediately explained to Mr. Whitney that he was
being stopped for a turn signal violation, and that Mr. Whitney
was charged with the traffic offense. Finally, neither Mr.
Whitney or Mr. Ewell has adduced any evidence disputing Corporal
Brock's testimony.

31.   Mr. Whitney contends that "it would have been very
difficult for the officer to take note of a turn signal," from
approximately 300 feet away (D.I. 52 at 5).  However, the Court

---

informant provided information about a situation close by.
     The Court must also take into account the content of the
tip in evaluating reasonable suspicion. Id. The informant
specifically identified a white Acura with Maryland plates and
tinted windows picking up a significant quantity of controlled
substances near the intersection of 27th Street and Madison
Street, in Wilmington, Delaware.  (Tr. 5-6.)  When Corporal
Brock arrived at the 27th Street location, he observed a white
Acura with Maryland plates and tinted windows (Tr. 6, 28),
facts which enhance the credibility of the informant. At the
27th Street location, Corporal Brock also observed an
individual leaning on the Acura engaged in conversation with
the car's passengers through the open window (Tr. 14), which,
in the context of the informant's tip, is behavior from which
he could have reasonably concluded that the Acura's passengers
were transacting a controlled substance.  Accordingly, the
Court concludes that the information from the informant had
sufficient indicia of reliability to support a reasonable
suspicion of criminal activity.

finds that the Acura and unmarked police vehicle were the only
two cars on the street at the time of the infraction and Corporal
Brock's view was unobstructed.  Additionally, the incident
occurred at night, and the Court finds that the appearance, or
lack thereof, of a blinking turn signal would be more apparent or
obvious to an observer in the dark than in daylight.

        32.  Mr. Ewell contends that the Officers acted on the basis
of an unreliable and uncorroborated tip, and therefore lacked
reasonable suspicion or probable cause to stop the vehicle on the
basis of suspected activity.  However, the Court has concluded
that the officers had a particularized and objective basis for
believing that a traffic infraction had occurred, and Mr. Ewell's
argument is foreclosed by Whren and its progeny.  Whren, 517 U.S.
813; see also Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d
Cir. 2003) ("motive, however, is irrelevant to the question
whether the objective facts available to the officers at the time
reasonably could have led the officers to conclude that Smith was
committing an offense.").

        33.  "[O]nce a car has been legally stopped, the police may
'escalate' the encounter by visually inspecting the interior of
the car, and checking credentials and asking questions of the
occupants." Mosley, 454 F.3d at 252 (quoting U.S. v. Givan, 320
F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was
justified at its inception, an officer who develops a reasonable,

                                    13

articulable suspicion of criminal activity may expand the scope
of the inquiry beyond the reason for the stop and detain the
vehicle and its occupants for further investigation.").  The law
enforcement officers testified that the labored breathing and
nervous, jittery behavior of Mr. Whitney and Mr. Ewell (Tr. 36),
and the white crumbs or specks resembling crack cocaine covering
Mr. Whitney's clothing (Tr. 69) caused them to suspect that there
were narcotics or contraband in the vehicle. The Court finds it
reasonable that Officer Stoddard's "spider senses went up" (Tr.
37) in light of Officers Stoddard and DuPont's observations at
the traffic stop, in conjunction with the proven veracity of
certain aspects of the informant's tip.[5]  Accordingly, the Court
finds that the law enforcement officers had a reasonable
suspicion of criminal activity so as to justify their visual
inspection of the Acura's interior.

34.      Mr. Ewell further contends that Officers' testimony
is inconsistent, as evidenced by Officers Stoddard and DuPont's
testimony that they did not notice the bag of crack cocaine on
Mr. Ewell's lap initially, despite the fact that Officer Stoddard
was standing on the passenger side of the vehicle, and Mr.
Whitney had attempted to search for his license in the glove
compartment. However, the record evidence establishes that the

_____

[5]For discussion of the reliability of the informant's tip,
see footnote 4 *infra*.

14

bag of crack cocaine was partially concealed by Mr. Ewell's

jacket, and hidden close to Mr. Ewell's right hip, which would

put it out of both Officers' direct line of sight.  Also, the

Court finds it likely that Mr. Ewell was attempting to conceal

the bag of crack cocaine hidden under his jacket from the

Officers' view.  Thus, the Court does not find that the Officers'

testimony is impugned for their failure to initially notice the

partially concealed bag of crack cocaine on Mr. Ewell's lap.

     35.     Accordingly, the Court will deny Mr. Whitney's and

Mr. Ewell's Motions to Suppress Physical Evidence.

     B.     <u>Whether Mr. Whitney is Entitled To The Suppression Of</u>
              <u>His Statements</u>

     36.     The Fifth Amendment provides that "no person. . .

shall be compelled in any criminal case to be a witness against

himself. . . ."  The Supreme Court, in <u>Miranda v. Arizona</u>, 384

U.S. 436, 444-45 (1966), held:

> the prosecution may not use statements, whether
> exculpatory or inculpatory, stemming from custodial
> interrogation of the defendant unless it
> demonstrates the use of procedural safeguards
> effective to secure the privilege against
> self-incrimination.  By custodial interrogation, we
> mean *questioning initiated by law enforcement*
> *officers after a person has been taken into custody*
> *or otherwise deprived of his freedom of action in*
> *any significant way.*  As for the procedural
> safeguards to be employed, unless other fully
> effective means are devised to inform the accused
> persons of their right of silence and to assure a
> continuous opportunity to exercise it, the
> following measures are required.  Prior to any
> questioning, the person must be warned that he has
> a right to remain silent, that any statement he

15

does make may be used as evidence against him, and
that he has a right to the presence of an attorney,
either retained or appointed.  The defendant may
waive effectuation of these rights, provided the
waiver is made voluntarily, knowingly and
intelligently.

Id. (emphasis added). "Miranda safeguards come into play whenever

a person in custody is subjected to either express questioning or

its functional equivalent." Rhode Island v. Innis, 446 U.S. 291,

301 (1980).

37.    The term "interrogation" under Miranda refers not

only to express questioning, but also to any words or actions

that the police know are likely to elicit an incriminating

response, or any response, inculpatory or exculpatory, that the

prosecution may seek to introduce at trial.  Id. at 301-302.

38.    "A person is in custody when he either is arrested

formally or his freedom of movement is restricted to the degree

associated with a formal arrest.  For a person to be in custody

when he has not been arrested, something must be said or done by

the authorities, either in their manner of approach or in the

tone or extent of their questioning, which indicates that they

would not have heeded a request to depart or to allow the suspect

to do so." United States v. Willaman, 437 F.3d 354, 359 (3d Cir.

2006)(internal citations omitted).

39.    Courts consider several factors when determining

whether a person was in custody, including "(1) whether the

16

officers told the suspect he was under arrest or free to leave;
(2) the location or physical surroundings of the interrogation;
(3) the length of the interrogation; (4) whether the officers
used coercive tactics such as hostile tones of voice, the display
of weapons, or physical restraint of the suspect's movement; and
(5) whether the suspect voluntarily submitted to questioning."
Id. at 359-360.

> 1. *Whether Mr. Whitney's Statement to Officer DuPont*
> *During the December 10, 2006 Traffic Stop Should*
> *Be Suppressed*

40. Mr. Whitney first contends that his statements to
Officer DuPont during the traffic stop are inadmissible and
should be suppressed. Mr. Whitney admits that "persons
momentarily detained during a routine traffic stop are not
normally considered 'in custody,'" but contends that "the highly
intrusive nature of the stop" resulted in a custodial
interrogation. (D.I. 52 at 7.) Specifically, Mr. Whitney
contends that (1) the stop was not of a "public nature" since it
occurred at around 2 a.m., and there were no other cars on the
street; and (2) the "interrogative intentions" of the police to
investigate suspected drug activity made the stop custodial in
nature. (Id.)

41. In Berkemer v. McCarty, 468 U.S. 420, 423 (1984),
the Supreme Court held that the roadside questioning of a
motorist detained pursuant to a traffic stop did not constitute a

17

custodial interrogation for purposes of <u>Miranda</u>. While the Court
acknowledged that "a traffic stop significantly curtails the
freedom of action of the driver and the passengers, if any of the
detained vehicle," the Court held that two features of an
"ordinary traffic stop mitigate the danger that a person
questioned will be induced to speak where he would not otherwise
do so freely." <u>Id</u>. at 436-437. First, because "detention of a
motorist pursuant to a traffic stop is presumptively temporary
and brief" and the "vast majority of roadside detentions last
only a few minutes," a motorist's expectations are that he will
spend a short period of time answering questions and waiting
while the officer checks his license and registration, but "that
in the end he most likely will be allowed to continue on his
way." <u>Id</u>. at 437. Second, since the typical traffic stop is in
public, and the detained motorist is typically confronted by, at
most, two policeman, "circumstances associated with the typical
traffic stop are not such that the motorist feels completely at
the mercy of the police." <u>Id</u>. at 438-439.

42.     Here, the circumstances in which Mr. Whitney made
his statements fall squarely within the Supreme Court's holding
in <u>Berkemer</u>. Prior to his arrest, Mr. Whitney was temporarily
detained for his failure to use a turn signal, and the Court
finds nothing in this interaction which would have led Mr.
Whitney to believe that his detention would not be temporary in

nature.   Officer DuPont immediately informed Mr. Whitney why he
had been pulled over, and asked him for his driver's license,
both actions typical of a routine, brief traffic stop, and
related to the reason for the stop.   Mr. Whitney's subsequent
jittery, nervous behavior and the white powdery crumbs resembling
crack cocaine on his lap and jacket led Officer DuPont to broaden
the scope of his inquiry.   Based on Mr. Whitney's behavior and
demeanor, the Court finds it was reasonable for Officer DuPont to
inquire about the white crumbs.   After the Officers located the
crack cocaine behind the driver's seat, Mr. Whitney was arrested.

        43.     Mr. Whitney cites no cases holding that a lawful
<u>Terry</u> stop is custodial for <u>Miranda</u> purposes simply because it
occurred at night and no other members of the public were present
to witness the interrogation. The Court is not persuaded that the
fact that no vehicles happened to drive by during the traffic
stop resulted in Mr. Whitney being subjected to "restraints
comparable to those associated with a formal arrest,"  especially
given the record evidence that the traffic stop occurred on a
well-lit, highly-traveled street near an on-ramp with a major
interstate highway.   <u>Id</u>. at 441.

        44.     With respect to Mr. Whitney's contention that
Officer DuPont's "interrogative intentions" made the traffic stop
custodial, "[a] policeman's unarticulated plan has no bearing on
whether a suspect was 'in custody' at a particular time; the only

relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." <u>Id</u>. at 442. In light of the Court's conclusion that a reasonable person in Mr. Whitney's situation would not have believed he was "in custody" so as to trigger his rights under <u>Miranda</u>, Officer DuPont's subjective intentions are not relevant.

45.    Accordingly, the Court concludes that Mr. Whitney's statements to the Officers during the traffic stop are admissible.

> 2.    *Whether Mr. Whitney's Statement to Special Agent*
> *Gorrell on March 6, 2007 Should Be Suppressed*

46.    Mr. Whitney also contends that his statement to Special Agent Gorrell on March 6, 2007 should be suppressed due to Special Agent Gorrell's failure to inform Mr. Whitney that his prior statements, before he had received <u>Miranda</u> warnings, could not be used against him.  Mr Whitney contends that he believed he was bound by his prior statements, and so he did not knowingly waive his rights.

47.    On January 12, 2007, Mr. Whitney was questioned by law enforcement officers, including Maryland investigators and agents of the United States Drug Enforcement Agency.  According to the Government, this interview was in the nature of a proffer, and no <u>Miranda</u> warnings were given or waived; accordingly, the Government will not seek to use any statements from this interview in its case-in-chief.

48.     Pursuant to _Elstad_, 470 U.S. at 309, "[t]hough _Miranda_ requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn ... solely on whether it is knowingly and voluntarily made." Thus, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." _Id_. at 314.

49.     "[W]here a statement is voluntary but made without the benefit of proper _Miranda_ warnings, '[a] subsequent administration of _Miranda_ warnings ... should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." _U.S. v. Naranjo_, 426 F.3d 221, 228 (3d Cir. 2005) (_quoting Elstad_, 470 U.S. at 314). "Absent deliberate coercion or improper tactics in obtaining an unwarned statement, a careful and thorough administration of _Miranda_ warnings cures the condition that rendered the unwarned statement inadmissible." _Reinert v. Larkins_, 379 F.3d 76, 90 (3d Cir. 2004).

50.     In _Missouri v. Seibert_, 542 U.S. 600 (2004), the Supreme Court carved out an exception to _Elstad_, addressing the admissibility of unwarned statements taken pursuant to an

21

official policy of questioning suspects without first giving
<u>Miranda</u> warnings, and then obtaining a second statement after
administrating the warnings. <u>Id</u>. at 616.  As set forth in Justice
Kennedy's concurrence, <u>Elstad's</u> legal standard applies unless a
two-step interrogation technique "was used in a calculated way to
undermine the <u>Miranda</u> warning." <u>Id.</u> at 622.

     51.    There is no evidence in the record here that
suggests the law enforcement agents withheld <u>Miranda</u> warnings on
January 12, 2007 as part of a "an intentional withholding that
was part of a larger, nefarious plot." <u>Reinert</u>, 379 F.3d at 91.
Accordingly, Court will apply <u>Elstad</u> rather than <u>Seibert</u> to
determine the admissibility of Mr. Whitney's March 6, 2007
statements.

     52.    When considering whether a post-<u>Miranda</u> "statement
was the result of a knowing, voluntary and intelligent waiver of
the protections implicit in the <u>Miranda</u> warnings," the Court may
consider who initiated the second interrogation, the passage of
time between the two interrogations, the extent to which the same
police were involved in both interrogations, the manner in which
the second interrogation was conducted, as well as any other
relevant factors.  <u>United States v. Tyler</u>, 164 F.3d 150, 158 (3d
Cir. 1998).

     53.    The Government bears the burden of establishing that
a waiver of rights was voluntary, knowing and intelligent.  <u>Id</u>.

22

at 156.  In determining whether the waiver was voluntary, knowing and intelligent, the Court must make a two-pronged inquiry: (1) The statement must be given voluntarily in the sense that it was the "product of a free and deliberate choice rather than the result of intimidation, coercion or deception;" and (2) The waiver must be knowing and intelligent, in the sense that it was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." U.S. v. Sriyuth, 98 F.3d 739, 748-749 (3d Cir. 1996)(internal citations omitted).

54.    To assess the validity of a waiver, the Court must consider the totality of the circumstances surrounding the interrogation. Id. at 749.  An express written statement of a waiver is strong proof as to the validity of a waiver. U.S. v. Kabiarets, 496 F.Supp.2d 394, 401 (D. Del. 2007).

55.    The Court finds the evidence demonstrates that Mr. Whitney knowingly, voluntarily and intelligently waived his Miranda rights on March 6, 2007.  Mr. Whitney's statement on March 6, 2007 was made to different law enforcement officers almost three months after his January 12, 2007 interview.  Also, Mr. Whitney has set forth no evidence suggesting that his March 6, 2007 statements were the result of "coercive or overbearing" investigative techniques.  Tyler, 164 F.3d at 158.

56.    The Court finds that Mr. Whitney either read each of

23

his <u>Miranda</u> rights out loud, or each of these rights was read to him.  (Tr. 97.)  Following the reading of each right, Mr. Whitney indicated his understanding of that right by initialing the form given to him by Special Agent Gorrell.  Mr. Whitney then either read a waiver of his <u>Miranda</u> rights, or a waiver of his <u>Miranda</u> rights was read to him, and Mr. Whitney signed the waiver.

57.    Mr. Whitney has not presented any evidence disputing Special Agent Gorrell's statement that Mr. Whitney did not appear to be under the influence of alcohol and drugs.  The Court also finds Mr. Whitney's ownership and operation of his own business, and his ownership of several real properties are persuasive evidence of his intelligence and ability to understand the <u>Miranda</u> rights he was waiving.

58.    Accordingly, the Court concludes that Mr. Whitney's waiver of his <u>Miranda</u> rights on March 6, 2007 was voluntary, knowing and intelligent, and the Court will deny Mr. Whitney's Motion to Suppress with respect to his statement to Special Agent Gorrell on this date.

**IV.  CONCLUSION**

For the reasons discussed, the Court will deny Mr. Whitneys's Motion To Suppress Physical Evidence And Statements (D.I. 33).  The Court will deny Mr. Ewell's Motion to Suppress Physical Evidence (D.I. 26).

An appropriate Order will be entered.

24